UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
**The Honorable Howard R. Tallman**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| MARK B. FICKES, JR. a/k/a MARK FICKES | ) | |
| a/k/a MARK MCBLAINE and MARITA C. | ) | Case No. 10-11271-HRT |
| FICKES a/k/a MARITA CLARK a/k/a | ) | Chapter 7 |
| MARITA M. FICKES, | ) | |
| | ) | |
| Debtors. | ) | |
| ———————————————— | ) | |
| | ) | |
| MARION FICKES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Adv. Proc. No. 10-01394-HRT |
| MARK B. FICKES, JR. a/k/a MARK FICKES | ) | |
| a/k/a MARK MCBLAINE and MARITA C. | ) | |
| FICKES a/k/a MARITA CLARK a/k/a | ) | |
| MARITA M. FICKES, | ) | |
| | ) | |
| Defendants. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This proceeding came before the Court for trial on May 23 and May 24, 2011 on Marion Fickes' (the "Plaintiff") Complaint to Determine Nondischargeability of Debt pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), 523(a)(6), and 727(a)(10)[1] (the "Complaint") [Docket No. 2] filed against Mark B. Fickes, Jr. a/k/a Mark Fickes a/k/a Mark McBlaine ("Mark Fickes") and Marita C. Fickes a/k/a Marita Clark a/k/a Marita M. Fickes ("Marita Fickes") (collectively, the "Defendants" or the "Debtors").[2] The Court has reviewed the testimony and the evidence presented, and hereby makes the following findings of fact and conclusions of law.[3]

---

[1] On December 16, 2010, the Court dismissed the Plaintiff's claim for relief under § 727(a)(10) [Docket No. 30].

[2] Unless otherwise stated, sections cited hereinafter are those contained within Title 11 of the United States Code (the "Bankruptcy Code" or the "Code").

[3] To the extent any findings of fact are construed as conclusions of law, they are adopted as such; to the extent any conclusions of law are construed as findings of fact, they are adopted as such.

## I.  BACKGROUND AND FINDINGS OF FACT

The facts of the case date back to 1993 when the Plaintiff, now 92 years old, executed a power of attorney in favor of her son, Mark Fickes, to make it easier for him to manage her finances should she become incompetent or otherwise unable to do so herself.  It was not until 2004 that the Plaintiff discovered the Defendants allegedly had written unauthorized checks from the Plaintiff's accounts, had allowed the accrual and payment of interest on a margin account, and had overpaid federal and state taxes.[4]  In 2005, the Plaintiff sued Mark and his wife, Marita Fickes, in state court.  That litigation culminated with a settlement agreement in February 2006 wherein the Defendants agreed to pay the Plaintiff an initial payment of $15,000.00 followed by monthly payments of $2,500.00 until the earlier of the repayment of $300,000.00 or the Plaintiff's death.  By agreeing to settle the matter, the Defendants did not admit to liability.

The Defendants paid pursuant to the settlement agreement until December 2009 at which point the remaining balance stood at $172,500.00.  On January 26, 2010, the Defendants filed their bankruptcy petition for relief under chapter 7.  The Plaintiff now seeks a nondischargeability determination.[5]

The Plaintiff alleges the following payments were unauthorized:[6]

| Date Written | Check No. | Payee | Person/Entity | Amount |
|---|---|---|---|---|
| | | | | |
| 02/15/1996 | 0101 | Marita Fickes | Defendant | $5,000.00 |
| 02/21/1996 | 0104 | McBlaine Designs | Defendants' business | $10,000.00 |
| 03/21/1996 | 0105 | McBlaine Designs | Defendants' business | $10,000.00 |
| 04/25/1996 | 0106 | Don Massey Cadillac | N/A | $27,035.75 |
| 09/23/1996 | 0109 | Marita C. Fickes | Defendant | $10,000.00 |
| 04/07/1998 | 0123 | McBlaine Designs | Defendants' business | $1,100.00 |
| 04/12/1999 | 0151 | M. Fickes | unknown | $1,000.00 |
| 04/14/1999 | 0152 | US Treasury | N/A | $1,800.00 |
| 04/28/1999 | 0153 | Matt Fickes | Defendants' son | $7,557.09 |
| 04/28/1999 | 0154 | Matt Fickes | Defendants' son | $500.00 |
| 09/14/1999 | 0161 | US Treasury/IRS | N/A | $36,880.49 |
| 12/27/1999 | 0165 | Matt Fickes | Defendants' son | $1,000.00 |
| 01/12/2000 | 2469 | McBlaine Designs | Defendants' business | $996.48 |
| 01/26/2000 | 0168 | Matt Fickes | Defendants' son | $2,000.00 |

---

[4]   Although monetarily insignificant, the Plaintiff also alleged several of her possessions had been sold, stolen, or otherwise disposed of, all without her consent.

[5]   No evidence was introduced as to whether the determination of nondischargeability pertains to the $172,500.00 balance remaining from the settlement agreement.  Likewise, no evidence was introduced as to the claims asserted in the state court action and any possible relevancy or connection to the present action before this Court.

[6]   This chart includes the payments listed in Exhibit 39 in addition to check nos. 0106, 0152, 0161, and 1061, which, the Plaintiff alleged during trial were unauthorized.

| | | | | |
|---|---|---|---|---|
| 01/27/2000 | 0169 | McBlaine Designs | Defendants' business | $500.00 |
| 03/21/2000 | 0172 | McBlaine Designs | Defendants' business | $10,000.00 |
| 06/02/2000 | 2545 | Mark Fickes | Defendant | $2,000.00 |
| 06/02/2000 | 2547 | McBlaine Designs | Defendants' business | $1,500.00 |
| 06/08/2000 | 0177 | McBlaine Designs | Defendants' business | $10,000.00 |
| 06/26/2000 | 0179 | M. Fickes | unknown | $3,000.00 |
| 09/13/2000 | 0183 | M. Fickes | unknown | $442.14 |
| 12/30/2000 | 0187 | Mark B. Fickes, Jr. | Defendant | $7,500.00 |
| 12/30/2000 | 0190 | Marita Fickes | Defendant | $7,500.00 |
| 02/13/2001 | 0193 | M. Fiches [sic] | unknown | $512.12 |
| 05/15/2003 | 1061 | Marion Fickes | Plaintiff | $9,000.00 |
| 05/17/2003 | 2521 | McBlaine Designs | Defendants' business | $2,556.50 |
| 12/05/2003 | 1064 | McBlaine Designs | Defendants' business | $1,700.00 |
| | | | | |
| | | | **TOTAL** | **$169,980.57**[7] |

## A.     Payments Found to Be Authorized by the Plaintiff.

As to the checks paid from the Plaintiff's accounts, the crux of the Plaintiff's argument is that she did not authorize such payments, such payments were improper, and Mark Fickes breached his fiduciary duties by signing the checks.  That said, the Defendants cannot be held liable for payments: (1) the Plaintiff admits, during trial, were actually authorized, or (2) for which the Plaintiff fails to carry her burden to prove the payments were unauthorized.

Although the Plaintiff pled she did not authorize any of the payments listed above totaling $169,980.57, the Plaintiff's own testimony or the Court's inferences confirms that the Plaintiff authorized the payment of five checks.

First, although the Plaintiff is certain that she gifted $3,000.00 to her grandson for his wedding, she does not know whether check no. 0165 in the amount of $1,000.00 and check no. 0168 in the amount of $2,000.00 constitute the $3,000.00 authorized payment, or whether check no. 0179 in the amount of $3,000.00 constitutes the authorized gift.  The Court finds the Plaintiff authorized $3,000.00 to be paid to her grandson for his wedding.

Second, during the Plaintiff's stay at Sunbridge,[8] the Defendants and their company, McBlaine Designs, designed and installed various interior décor in the Plaintiff's Sunbridge home.  Indeed, the Plaintiff does not dispute she paid for the services and believes she authorized

---

[7]     This is the maximum amount the Plaintiff can prove is nondischargeable.

[8]     The Plaintiff moved several times during the time period relevant to this case: (1) in 1991, from Lincoln, Nebraska to Greenpointe Way in Denver, Colorado; (2) in 1998, from Greenpointe Way to Sunbridge retirement home; (3) also in 1998, from Sunbridge to Palamino Park; (4) in 2003 or 2004, from Palamino Park to Porter Place; (5) in April 2004, from Porter Place back to Palamino Park; and, (6) during the course of the state court litigation, from Palamino Park back to Lincoln Nebraska.

check no. 0123 written on April 7, 1998 and payable to McBlaine Designs for $1,100.00 for "draperies, headboard, etc."[9]  Upon comparing the check date and the amount payable with approximate move-in dates, the Court finds check no. 0123 was authorized by the Plaintiff.

Third, the Defendants testified check no. 0183 in the amount of $442.14 was reimbursement from the Plaintiff for airline tickets and housekeeping services utilized by the Plaintiff.  Although the Plaintiff is uncertain whether she authorized check no. 0183, she testified that she did occasionally reimburse the Defendants for items they purchased for her.  Given the testimony and the small and irregular amount involved, the Court concludes that check no. 0183 was reimbursement for services or goods paid for by the Defendants.

Fourth, the Plaintiff testified it is possible that she authorized the payment of check no. 0193 in the amount of $512.12.  The Defendants testified the Plaintiff authorized all checks to be paid and they frequently reimbursed themselves for items purchased for the Plaintiff.  Similar to check no. 0183, the Court finds check no. 0193 was authorized.

**B.**     **The Witnesses, the Plaintiff's Mental Health, and Certain Checks Allegedly Authorized.**

The Plaintiff has an undergraduate degree and is a retired schoolteacher.  During trial, the Court found the Plaintiff credible.  She maintained most of her life savings in a brokerage account and was opposed to "spending down" her assets to qualify for Medicare, neither desiring to participate in any such plan nor authorizing anyone to "spend down" her assets.

Gabriel Banick testified on behalf of the Plaintiff.  Gabriel is a college dean and has been close friends with the Plaintiff for the last thirty-six years.  She visits the Plaintiff several times each year and has visited each of the Plaintiff's several homes in the Denver area, including several overnight stays.

Jean Parsons also testified on behalf of the Plaintiff.  Jean has known the Plaintiff for the last nineteen years.  She has a close relationship with the Plaintiff, and the Plaintiff has stayed with Jean on various occasions.  When the Plaintiff was living in the Denver area, she and the Plaintiff would see each other one to two times a week, dining together and attending club meetings.  Jean also testified to a conversation she had with Mark Fickes where she learned he was in favor of "spending down" one's assets in order to qualify for Medicare benefits.

Maraya Cowden was the Defendants' first witness.  She is the Defendants' daughter and the Plaintiff's granddaughter.  Maraya testified the Plaintiff's mental health has deteriorated, the Plaintiff is no longer stable, and the Plaintiff would confuse television shows with real life and would become paranoid and angry at times.

---

[9]        Exhibit 40.

4

The Defendants' second witness was Matthew Fickes, the Defendants' son and the Plaintiff's grandson. Matthew testified he felt the Plaintiff was out of touch with reality and would confuse television shows with real life.

The Court finds the testimony of Gabriel and Jean quite credible and more persuasive than the testimony of Maraya and Matthew. The Court places little value on the children's testimony because: (1) of the relationship to their parent-Defendants; (2) their testimony was inconsistent with the Court's direct observation of the Plaintiff during trial; and (3) the Defendants failed to introduce any type of medical affidavit corroborating the children's beliefs that the Plaintiff's mental health was deteriorating. Consequently, upon the Court's own assessment of the Plaintiff and based on the testimony from Gabriel and Jean, the Court finds the Plaintiff's memory intact. The Plaintiff apparently does not suffer from any memory related issues that would call her testimony into question.

Mark Fickes is an interior decorator and owns McBlaine Designs. The Court does not find Mark entirely credible but does find that he favored "spending down" one's assets in order to qualify for Medicare benefits. Although he testified that the Plaintiff authorized him to sign check nos. 0151, 0153, 0154, 0161, 0165, 0169, 0177, 0187, 0190,[10] and 0193,[11] the Plaintiff's testimony contradicts this.

Matthew Fickes testified he had difficulty obtaining a mortgage and claims the Plaintiff offered to help financially by providing him with check no. 0153 in the amount of $7,557.09. The Plaintiff testified she did not authorize check no. 0153 to be paid and if she had authorized its payment, she would have gifted the same amount to her granddaughter. Although Matthew also testified that he believes check no. 0154 was for the wedding dress, his deposition testimony indicates otherwise. The Plaintiff testified she did not authorize check no. 0154 and did not offer to pay for a wedding dress apart from the $3,000.00 gift allowed for wedding expenses. The Court finds the Plaintiff's testimony credible and more persuasive than Matthew's testimony, which appeared to have been based on what was told to him by his parents rather than his own personal knowledge. The Court thus finds that the Plaintiff did not authorize check nos. 0153 and 0154.

The Defendants testified check nos. 0101, 0109, 0151,[12] 0179, and 2545 were authorized by the Plaintiff. The Plaintiff, on the other hand, testified she did not authorize these payments. Check nos. 0101 and 0109 were payable to Marita Fickes in the respective amounts of $5,000.00 and $10,000.00. As an initial matter, the Court finds the testimony from Marita not credible. She could not provide an explanation for the two large payments yet insists they were authorized.

---

[10]   Mark Fickes testified he does not know why he wrote check nos. 187 and 190 notwithstanding one is made payable to him for $7,500.00 and the other is made payable to his wife for $7,500.00. The Plaintiff's testimony that she did not authorize either of these checks is credible.

[11]   The Court previously found the Plaintiff actually authorized check nos. 0165 and 0193.

[12]   The memo on check no. 0151 reads "transfer to local account." The Plaintiff testified it is impossible any transfer was made to her local account.

As to check no. 0151 in the amount of $1,000.00 payable to "M. Fickes,"[13] check no. 0179 also payable to "M. Fickes" in the amount of $3,000.00, and check no. 2545 payable to Mark Fickes in the amount of $2,000.00, the Court places a much higher value on the Plaintiff's testimony than the Defendants' directly contrary testimony.  The Defendants were the only persons with custody of the Plaintiff's checkbook, and despite their control over the Plaintiff's funds, the Defendants provided no documentary evidence to support their position.  The Court finds the Plaintiff did not authorize check nos. 0101, 0109, 0151, 0179, and 2545.

### C.    The Loans Allegedly Made to McBlaine Designs.

In December 1995, the Plaintiff loaned the Defendants $40,000.00, which was memorialized in a promissory note whereby the Defendants were to repay the principal plus interest in monthly payments of $466.67.[14]   The note provided a late charge of 1% of any payment not received by the Plaintiff within 20 days after the payment is due.  The obligation was secured by a deed of trust on the Defendants' home.[15]   The Defendants repaid the $40,000.00 and the interest due on the promissory note.[16]  This fact is important as it shows the Plaintiff's sophistication in documenting loans made to the Defendants.

Marita Fickes assists her husband with their business, McBlaine Designs, and is a former certified public account with thirty years of experience.  She testified that the Plaintiff's mental condition had deteriorated between 1991 and 2005, the year in which the witness last saw the Plaintiff.[17]   As the Court previously found, the Court has observed Marita and finds her credibility lacking.  Marita testified that check nos. 0101, 0104, 0105, 0109, 0172, 0177 were for short-term loans authorized and made by the Plaintiff for the Defendants' business' purchase of inventory, the repayment of which was made in full by paying the Plaintiff's rent.[18]  Marita claims it was too expensive to execute another promissory note and that the Plaintiff did not request it.  She also testified that checks nos. 187 and 190 payable to her husband and herself, respectively, each in the amount of $7,500.00, were authorized by the Plaintiff to "spend down" her brokerage account to qualify for Medicare.  This testimony is directly contradicted by the

---

[13]     Interestingly, "M. Fickes" could refer to Mark Fickes, Marita Fickes, Marion Fickes, Maraya Fickes, or Matthew Fickes.

[14]     Exhibit 42.

[15]     Exhibit 44.

[16]     The Plaintiff admits the Defendants repaid the loan in its entirety.

[17]     Without medical documentation supporting the assertion, the Court cannot find the Plaintiff exhibited any mental loss.  Further, as previously noted, the Court fully observed the Plaintiff and finds her to be coherent and credible.

[18]     Marita Fickes also testified that all checks written to McBlaine Designs were authorized.  Thus, she asserts check nos. 0104, 0105, 0123, 0169, 0172, 0177, 1064, 2469, 2521, and 2547 were authorized by the Plaintiff as well.

Plaintiff's testimony that she did not authorize these payments and is opposed to "spending down" her assets.

The past practice between the parties demonstrates the Plaintiff's sophistication in documenting loans made to the Defendants. The absence of any such formality concerning the checks paid to McBlaine Designs, coupled with the Defendants' failure to introduce any evidence of repayment, leads this Court to find that the Plaintiff did not loan any additional money to McBlaine Designs. Thus, the Plaintiff did not authorize check nos. 0101,[19] 0104, 0105, 0169, 0172, 0177, 1064, 2469, 2521, and 2547.[20]

### D.     The Two Payments in the Amount of $7,500.00 to "Spend Down" the Plaintiff's Assets.

As to check nos. 0187 and 0190, the Plaintiff testified she did not authorize the payments and was opposed to "spending down" her assets. Jean Parsons testified that Mark Fickes was in favor of "spending down" assets to qualify for Medicare. Although the Defendants both claim the Plaintiff authorized the payments to "spend down" her assets, the Court is not convinced. The testimony from the Plaintiff and Jean Parsons, which, respectively, indicate that the Plaintiff opposed "spending down" her assets and Mark favored "spending down" assets, leads the Court to conclude that the Plaintiff did not authorize check nos. 0187 and 0190.[21]

### E.     The Settlement Agreement.

The Plaintiff contacted her present attorney who filed a state court lawsuit against the Defendants on the Plaintiff's behalf. In 2006, the Defendants entered into a settlement agreement with the Plaintiff. The Defendants confessed to judgment in the amount of $300,000.00, but not to liability. Judgment would not be entered unless the Defendants failed to make timely payments. The Defendants began making payments pursuant to the settlement agreement until January 2009. Soon thereafter the Plaintiff filed the confession of judgment. On January 26, 2010, one year after default, the Defendants filed their bankruptcy petition. The remaining balance on the settlement agreement stands at $172,500.00. The Court is without any

---

[19]     Although the Court previously found check no. 0101 was unauthorized, the Court also finds this check was unauthorized for the additional stated reason.

[20]     The Court finds that although Marita Fickes testified all checks made to McBlaine Designs were authorized loans by the Plaintiff, she also testified, which the Plaintiff corroborated, that the Plaintiff authorized payment to McBlaine Designs for certain interior decorating services provided to the Plaintiff. The Court previously found check no. 0123 to be such an authorized payment. The parties contest whether other payments to McBlaine Designs were for the same proper purpose. However, since the Plaintiff was living at Palamino Park from 1998 to 2003 or 2004, and since the Plaintiff and Defendants testified that the interior decorating services were provided at or near the Plaintiff's several move-in dates, the Court infers and finds check no. 0169 written on January 27, 2000 in the amount of $500.00 and check no. 2547 written on June 2, 2000 in the amount of $1,500.00 were not payments made in connection with interior decorating expenses.

[21]     The Court cannot find any facts concerning check nos. 0106, 0152, 0161, and 1061. Such payments will be discussed in the Conclusions of Law section.

evidence to determine whether there is a connection between the settlement of the state court action and the present nondischargeability action before this Court.

## II.   CONCLUSIONS OF LAW

A plaintiff in a § 523 action carries the burden of proof.  *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).  The standard of proof applicable to a plaintiff in a § 523 action is the preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).

### A.   The Payments and Losses on Which the Plaintiff Failed to Meet Her Burden of Proof.

First, the Plaintiff testified she did not authorize payment of check no. 0106 written on April 25, 1996 and payable to Don Massey Cadillac in the amount of $27,035.75.  Mark Fickes testified that the Plaintiff purchased the Cadillac from him but since the Don Massey dealership acted as a dealer-conduit, payment was made to Don Massey.  The Plaintiff did not testify whether she ever purchased a Cadillac or even drove a Cadillac.  In February 1998, less than two years after check no. 0106 was paid, the Plaintiff sold whatever car she owned at that time for $18,000.00.  The Plaintiff did not introduce any evidence showing whether the car sold in February 1998 was the Cadillac allegedly purchased in April 1996 or not.  Thus, the Plaintiff did not meet her burden in showing that check no. 0106 was unauthorized.

Second, the Plaintiff did not present any evidence concerning check no. 0152 payable to the U.S. Treasury in the amount of $1,800.00, and the Court is without sufficient facts to make any inferences.  As such, the Plaintiff failed to meet her burden by a preponderance of the evidence.

Third, check no. 1061 in the amount of $9,000.00 made payable to the Plaintiff, was deposited into account no. XXXXXX1328, the joint account of the Plaintiff and the Mark Fickes.[22]  The memo on the check reads "transfer to local account."  Although the Plaintiff testified she did not sign this check, the check was deposited into her own account, and so the check merely transferred her money from her one account to her other account.  The Plaintiff did not introduce any evidence that this money was subsequently withdrawn from the account into which check no. 1061 was deposited.  Thus, although the Plaintiff claims she did not authorize check no. 1061, the payment did not harm the Plaintiff since it was deposited into her other account.

Fourth, although Marita Fickes, as an accountant and former CPA, typically would complete the Plaintiff's tax returns, she did not do so for the 1995 return, causing the IRS to issue a tax deficiency notice of $36,000.00, plus interest and penalties.  The Defendants did not act on the deficiency until 1999 when, unbeknownst to the Plaintiff, Marita wrote check no. 0161

---

[22]       Check no. 2521, contained within Exhibit 40, shows account no. XXXXXX1328 as being the account of the Plaintiff and Mark Fickes.  The Court used this information to conclude that check no. 1061, deposited into the same account, was deposited into the joint account of the Plaintiff and Mark Fickes.

in the amount of $36,000.00 payable to the IRS from the Plaintiff's brokerage account without confirming with the Plaintiff the accuracy of the assessment.[23]   A similar deficiency was assessed under the Plaintiff's Colorado state returns but neither party introduced any evidence other than the fact that a deficiency was assessed.   The Plaintiff testified the $36,000.00 deficiency assessment was incorrect and was significantly overstated.   She later contacted the IRS to request a refund of the money paid and received a partial refund.   The Defendants claim they paid the tax deficiency because they had no records or documents to review and determine whether the basis asserted by the IRS was indeed correct.   The Plaintiff did not introduce into evidence the 1995 federal or state tax returns or any documents showing the partial refund amount the Plaintiff allegedly received from the IRS.   Thus, the Court is without sufficient information to determine whether the Plaintiff suffered injury as a result of the payment of check no. 0161.   The Court finds the Plaintiff failed to meet her burden of proof as to this issue.[24]

Fifth, in addition to the deficiency on the 1995 return, the IRS also assessed a deficiency on the Plaintiff's 1996 return.   Like with the 1995 return, Marita Fickes did not complete the Plaintiff's 1996 federal or state returns, causing the IRS to issue a deficiency of an unknown amount.[25]   A similar tax deficiency issue occurred with the Plaintiff's state returns but insufficient evidence was presented to make any further findings or conclusions.   In 2006, the Plaintiff filed her 1996 federal tax return, claiming payments in the amount of $57,782.17.[26]   Neither party introduced evidence explaining the source of the $57,782.17 payments.   The Plaintiff, however, received a portion of the alleged tax overpayment, but no evidence was introduced showing the amount received.   Although the Court finds the Plaintiff did not authorize any check to be paid on either the 1996 federal or state tax return,[27] the evidence is deficient for this Court to make any further findings, including whether the Plaintiff suffered any damage.   The Plaintiff has failed to meet her burden in proving her case as to all overpayments allegedly made on the 1996 tax return.[28]

Sixth, the Plaintiff failed to introduce evidence sufficient for the Court to make any findings concerning any alleged loss resulting from the margin account.   The only evidence introduced was several brokerage account statements and the Plaintiff's own testimony that she herself opened the margin account.   The Plaintiff did not have her broker testify as to any of the stock purchases or sales from her investment accounts.   The Court cannot and will not speculate

---

[23]     The $36,000.00 payment did not include the interest or penalties assessed by the IRS.   It appears Marita wrote the check but Mark signed the check.

[24]     The Plaintiff has also failed to meet her burden to the extent the Plaintiff alleges any payments made on the 1995 state return were unauthorized.

[25]     The Plaintiff did not introduce into evidence any documents showing the amounts paid.

[26]     Exhibit 35.

[27]     The Plaintiff also did not introduce into evidence any documents showing any amounts actually paid by the Defendants pursuant to the power of attorney.

[28]     The Plaintiff has also failed to meet her burden to the extent the Plaintiff alleges any payments made on the 1996 state return were unauthorized.

as to how these margin charges arose.  Accordingly, the Court finds the Plaintiff failed to meet her burden of proof to show the Defendants are somehow responsible for the losses or the margin interest charged to the Plaintiff.

Seventh, the Plaintiff failed to introduce evidence sufficient for the Court to make any findings concerning any of the Plaintiff's alleged lost or sold possessions, including her furniture and quilt.  Again, the Court finds the Plaintiff failed to meet her burden of proof by the preponderance of the evidence on this issue.

The following payments remain in dispute:

| Date Written | Check No. | Payee | Person/Entity | Amount |
|---|---|---|---|---|
| | | | | |
| 02/15/1996 | 0101 | Marita Fickes | Defendant | $5,000.00 |
| 02/21/1996 | 0104 | McBlaine Designs | Defendants' business | $10,000.00 |
| 03/21/1996 | 0105 | McBlaine Designs | Defendants' business | $10,000.00 |
| *deleted* | | | | |
| 09/23/1996 | 0109 | Marita C. Fickes | Defendant | $10,000.00 |
| *deleted* | | | | |
| 04/12/1999 | 0151 | M. Fickes | unknown | $1,000.00 |
| *deleted* | | | | |
| 04/28/1999 | 0153 | Matt Fickes | Defendants' son | $7,557.09 |
| 04/28/1999 | 0154 | Matt Fickes | Defendants' son | $500.00 |
| *deleted* | | | | |
| *deleted* | | | | |
| 01/12/2000 | 2469 | McBlaine Designs | Defendants' business | $996.48 |
| *deleted* | | | | |
| 01/27/2000 | 0169 | McBlaine Designs | Defendants' business | $500.00 |
| 03/21/2000 | 0172 | McBlaine Designs | Defendants' business | $10,000.00 |
| 06/02/2000 | 2545 | Mark Fickes | Defendant | $2,000.00 |
| 06/02/2000 | 2547 | McBlaine Designs | Defendants' business | $1,500.00 |
| 06/08/2000 | 0177 | McBlaine Designs | Defendants' business | $10,000.00 |
| 06/26/2000 | 0179 | M. Fickes | unknown | $3,000.00 |
| *deleted* | | | | |
| 12/30/2000 | 0187 | Mark B. Fickes, Jr. | Defendant | $7,500.00 |
| 12/30/2000 | 0190 | Marita Fickes | Defendant | $7,500.00 |
| *deleted* | | | | |
| *deleted* | | | | |
| 05/17/2003 | 2521 | McBlaine Designs | Defendants' business | $2,556.50 |
| 12/05/2003 | 1064 | McBlaine Designs | Defendants' business | $1,700.00 |
| | | | | |

| | | | **TOTAL** | $91,310.07[29] |
|---|---|---|---|---|

The Court will now proceed with its § 523 analysis of the $91,310.07 in payments listed above. The Plaintiff still bears the burden of proof by a preponderance of the evidence showing each payment is nondischargeable pursuant to §§ 523(a)(2)(A), (a)(4), or (a)(6).

**B.     Section 523(a)(2)(A).**

Section 523(a)(2)(A) provides in pertinent part:

(a)     A discharge under section 727…of this title does not discharge an individual debtor from any debt—

　　　(2)     for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

　　　　　(A)     false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

Although a claim under § 523(a)(2)(A) includes three sub-claims—false pretenses, a false representation, and actual fraud—the Tenth Circuit, in dicta, has grouped the sub-claims together.[30] Hence, in order to establish a nondischargeable claim under § 523(a)(2)(A), a creditor must prove, by a preponderance of the evidence, that (1) the debtor made a false representation; (2) the debtor intended to deceive the creditor; (3) the creditor relied on the representation; (4) the creditor's reliance was reasonable; and (5) the debtor's representation caused the creditor to sustain a loss. *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991); *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

---

[29]     After removing payments the Court has found the Plaintiff authorized or failed to meet her burden, by a preponderance of the evidence, of proving such payments were unauthorized, this figure represents the amended maximum amount that the Plaintiff can prove is nondischargeable.

[30]     False pretenses include implied misrepresentations or conduct intended to create or foster a false impression. *In re Sarama*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996); *see In re Young*, 91 F.3d 1367, 1374 (10th Cir. 1996) (citing *Itaparica, Ltd. v. Hargrove (In re Hargrove)*, 164 B.R. 768, 772 (Bankr. N.D. Okla. 1994) (recognizing that an implied representation constitutes "false pretenses" for purposes of § 523(a)(2)(A))).

A false representation is "an express misrepresentation that can be demonstrated either by a spoken or written statement or through conduct." *In re Morgan*, 2011 WL 3651327 *4 (Bankr. N.D. Ill. 2011) (quoting *New Austin Roosevelt Currency Exch., Inc. v. Sanchez (In re Sanchez)*, 277 B.R. 904, 908 (Bankr. N.D. Ill. 2002)); see *In re Young*, 91 F.3d 1367, 1374 (10th Cir. 1996) (citing *In re Gans*, 75 B.R. 474, 484 (Bankr. S.D.N.Y. 1987)) (holding that the failing to disclose information may be characterized as a misrepresentation for purposes of § 523(a)(2)(A))).

Actual fraud may encompass "any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another[.]" *In re Morgan*, 2011 WL 3651327 *5 (Bankr. N.D. Ill. 2011).

As to the first element, the Plaintiff did not offer evidence of any false representation made by the Defendant.[31]  The Court has reviewed the pleadings and testimony heard during trial and cannot find any evidence alleging or showing the Defendants made a single false representation.  If the false representation is the power of attorney itself, this argument was never advanced with the specificity required.  Since the Plaintiff has failed to prove a false statement was made, there is no need to continue the analysis.  The Plaintiff's claim pursuant to § 523(a)(2)(A) fails as a matter of law.

### C.    Section 523(a)(4).

Section 523(a)(4) provides in pertinent part:

(a)    A discharge under section 727…of this title does not discharge an individual debtor from any debt—

(4)    for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

### 1.    Fraud or Defalcation While Acting in a Fiduciary Capacity.

A plaintiff in a § 523(a)(4) action must prove, by a preponderance of the evidence, two elements: (1) that a fiduciary relationship existed between the parties; and (2) that the debt was attributable to fraud or defalcation committed by the defendant in the course of that fiduciary relationship.  *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991); *In re Siegfried*, 5 Fed.Appx. 856, 859 (10th Cir. 2001) (unpublished).

"[A] § 523(a)(4) fiduciary relationship requires either an express trust in the parties' contract or a trust that is specifically imposed by statute."  *In re Sawaged*, 2011 WL 880464, * 3 (10th Cir. BAP 2011).  "While 'the existence of a fiduciary relationship under § 523(a)(4) is determined under federal law,' state law is relevant to this inquiry."  *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1371 (10th Cir. 1996)).  Under Colorado law, a "power of attorney is an instrument by which a principal confers express authority on an agent to perform certain acts or kinds of acts on the principal's behalf."  *Matter of Trust of Franzen,* 955 P.2d 1018, 1021 (Colo. 1998) (citing *Willey v. Mayer*, 876 P.2d 1260 (Colo. 1994)).  Colorado law provides:

Whenever the agent exercises the powers granted by the agency, the agent shall use due care to act in the best interests of the principal in accordance with the terms of the agency.  Any agent who acts under an agency instrument shall be liable for any breach of legal duty owed by the agent to the principal under Colorado law.

Colo. Rev. Stat. § 15-14-606.  The power of attorney provided that the Plaintiff "hereby make[s] and grant[s] a general power of attorney to [Mark Fickes]…and appoint said individual as my

---

[31]      Likewise, the Court cannot find any evidence showing conduct intended to foster a false impression or plan involving direct and active operation of the mind.

attorney-in-fact,[32] [who] shall have full powers and authority to do and undertake all acts on my behalf that I could do personally…including but not limited [to] the right to sell...or dispose of any of my present or future personal property; the right to execute…and perform any and all contracts in my name; the right to…withdraw funds…from my bank accounts, depositories…the right to borrow…funds on any terms…"[33]   The power of attorney also provided that Mark Fickes "agrees to act and perform in said fiduciary capacity consistent with my best interests as he in his best discretion deems advisable…"[34]   Under Colorado law, the power of attorney language in this case "clear[ly], explicit[ly], definite[ly], unequivocal[ly], and unambiguous[ly]" establishes the Plaintiff's brokerage and bank accounts as property over which Mark Fickes acted as a fiduciary for the Plaintiff.  *Morgan v. Wright*, 156 Colo. 411, 415 (Colo. 1965).

Likewise, in the Tenth Circuit, in order to establish that a fiduciary relationship existed, "the court must find that the money or property on which the debt at issue was based was entrusted to the debtor." *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1371 (10th Cir. 1996).  The power of attorney included, without limitation, that Mark Fickes accepted his appointment and agreed to perform his duties in a fiduciary capacity as to the right to sell or dispose of any of the Plaintiff's personal property, and the right to withdraw funds and to borrow money.  This language leads the Court to conclude that the Plaintiff's accounts, out of which several payments were made, were entrusted to Mark Fickes.

The Plaintiff must show that "the fiduciary relationship…exist[ed] prior to the creation of the debt in controversy." *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1372 (10th Cir. 1996).  Here, Mark Fickes became a fiduciary for the Plaintiff at the time he signed the power of attorney on August 2, 1993.  The first of many checks was written on February 15, 1996.  Thus, the Plaintiff has shown that a fiduciary relationship existed prior to the creation of the debt in question.

Under § 523(a)(4), the Plaintiff must show the debt is attributable to fraud or defalcation, which was committed by Mark Fickes in the course of the fiduciary relationship.  "Creditors often prefer to assert the defalcation in a fiduciary capacity exception because the term 'defalcation' has consistently been interpreted to encompass a wider spectrum of conduct than that which is included in the terms 'fraud,' 'embezzlement' and 'larceny,' and because many courts have held that the debtor's bad faith or misconduct is not a necessary element of this exception."  Peter M. Reinhardt and William G. Horlbeck, *Defalcation While Acting in a Fiduciary Capacity: What Does it Mean?*, 24 COLAW 1773, 1773 (August 1995), *but see*, *In re Millikan*, 188 Fed. Appx. 699 (10th Cir. 2006) (unpublished) (quoting *Cent. Hanover Bank v. Herbst*, 93 F.2d 510, 512 (2d Cir. 1937) (holding that defalcation requires at least some portion of misconduct)).

---

[32]     Exhibit 1 ¶ 1.

[33]     Exhibit 1 ¶ 2.

[34]     Exhibit 1 ¶ 3.

Although the Code does not define defalcation, the term refers to the "failure to account for money or property entrusted to a fiduciary," whether intentional, willful, reckless, or negligent, and "is broader than fraud, embezzlement or misappropriation." *Defalcation While Acting in a Fiduciary Capacity: What Does it Mean?*, supra at 1773. "Failure to account" is "not used in the same context as 'to provide an accounting.' It refers to a deficit resulting from the debtor's failure to obey the terms of the trust." *In re Olinger*, 165 B.R. 283, fn. 3 (Bankr. D. Colo. 1994) (citing *San Saba Pecan, Inc. v. Failing (In re Failing)*, 124 B.R. 340, 344 (W.D. Okla. 1989)). "[T]he common fact pattern for liability [for defalcation] is the trustee's use of the *res* for his or her self-interest." *In re Woods*, 284 B.R. 282, 290 (D. Colo. 2001).

In *Olinger*, the fiduciary obtained loans from the trust without authorization pursuant to the trust agreement, "resulting in a reduction in the amount of funds available." *In re Olinger*, 165 B.R. 283, 286 (Bankr. D. Colo. 1994). In concluding that the fiduciary's actions constituted defalcation, the Court noted: "even if misconduct is an element of defalcation, [the fiduciary's] failure to observe the restrictions in the [ ] trust agreement is sufficient to find misconduct." *In re Olinger*, 165 B.R. 283, 286 (Bankr. D. Colo. 1994). After *Olinger*, the Tenth Circuit held that defalcation requires at least "some portion of misconduct." *In re Millikan*, 188 Fed. Appx. 699, 702 (10th Cir. 2006) (unpublished) (quoting *Cent. Hanover Bank v. Herbst*, 93 F.2d 510, 512 (2d Cir. 1937)).

By signing the checks to himself and his wife, their business, and their children, Mark Fickes reduced the amount of funds available to the Plaintiff. Although the Plaintiff initially bears the burden of proof by preponderance of the evidence, the Plaintiff overcame her burden by providing credible testimony that she did not authorize the payments and introducing evidence of her past practice of documenting loans. The burden now rests on the Defendants.

The general power of attorney granted in favor of Mark Fickes provided that he "agrees to act and perform in said fiduciary capacity consistent with my best interests as he in his best discretion deems advisable…"[35] The Defendants failed to provide reliable testimony indicating the Plaintiff authorized the payments. They also failed to produce documentation, which could have been their own bank account statements or company records, showing the business loans alleged to have been made by the Plaintiff actually were made and repaid. The Defendants likewise failed to provide any explanation for large sums of money being paid to them or their children. In fact, Mark did not proffer any credible, supportable argument—or otherwise explain—how paying a total of $91,310.07 to himself and his wife, their business, and their children was in the Plaintiff's best interests. By signing checks on the Plaintiff's accounts, or allowing checks to be paid from the Plaintiff's accounts, Mark Fickes engaged in misconduct by failing to observe the restrictions in the power of attorney, which directly reduced the balances in the Plaintiff's bank accounts. Such payments were not in the best interests of the Plaintiff and were not a reasonable exercise by Mark Fickes in carrying out his fiduciary duties under the power of attorney. Accordingly, the Plaintiff has shown that Mark Fickes committed wrongful defalcation when, without any authorization, Mark signed checks on the Plaintiff's accounts to benefit himself, his wife, his business, and his children.

---

[35]     Exhibit 1 ¶ 3.

The Plaintiff must also prove that the defalcation occurred in the course of the fiduciary relationship. Mark Fickes became fiduciary for the Plaintiff at the time he signed the power of attorney on August 2, 1993, which continued to be in effect through at least December 2003. The period during which the checks were written was from February 15, 1996 to at least December 5, 2003. Thus, all checks were written during the effective period of the power of attorney. The Plaintiff has shown that Mark Fickes committed defalcation during the course of the fiduciary relationship.

The Plaintiff has shown that a fiduciary relationship existed between Mark Fickes and her.[36] Under federal law and Colorado law, and pursuant to the general power of attorney, Mark Fickes was under an obligation to use due care to act in the best interests of the Plaintiff. Mark failed to demonstrate he used due care in acting in the Plaintiff's best interest. Mark breached his fiduciary duty by signing $91,310.07 in checks without any authorization from the Plaintiff or in accordance with the power of attorney. Given the Defendants' failure to adequately support their explanations, the Court concludes that such payments were made for improper purposes, causing harm to the Plaintiff in the amount of $91,310.07. A nondischargeable judgment in the amount of $91,310.07 will enter against Mark Fickes pursuant to § 523(a)(4) for breach of fiduciary duty.

### 2.    Embezzlement.

The plain language of § 523(a)(4) does not require a fiduciary relationship to exist for a debt for embezzlement or larceny to be nondischargeable. Under federal common law, embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Wallace*, 840 F.2d 762, 765 (10th Cir. 1988) (citing *Great American Insurance Co. v. Graziano (In re Graziano)*, 35 B.R. 589, 594 (Bankr. E.D.N.Y. 1983) (quoting *Gribble v. Carlton (In re Carlton)*, 26 B.R. 202, 205 (Bankr. M.D. Tenn. 1982))). "Embezzlement, for purposes of 11 U.S.C. § 523…requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud.'" *In re Black*, 787 F.2d 503, 507 (10th Cir. 1986), *rev'd on other grounds*, *Grogan v. Garner*, 498 U.S. 279 (1991), (quoting *United States Life Title Insurance Co. v. Dohm (In re Dohm)*, 19 B.R. 134, 138 (Bankr. N.D.Ill. 1982) (quoting *American Family Insurance Group v. Gumieny (In re Gumieny)*, 8 B.R. 602, 605 (Bankr. E.D. Wis. 1981))). For purposes of establishing nondischargeability under § 523(a)(4), the Tenth Circuit uses the federal common law definition of embezzlement. *In re Wallace*, 840 F.2d 762, 765 (10th Cir. 1988).

Three elements are required to show embezzlement: "(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which it was entrusted; and (3) circumstances indicating fraud." *Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991).

---

[36]        No fiduciary relationship existed between the Plaintiff and Marita Fickes. No evidence was presented indicating Marita Fickes served as an officer to McBlaine Designs.

i.      **Mark Fickes.**

The power of attorney caused the Plaintiff's accounts to become property entrusted to Mark Fickes, rendering Mark's initial possession lawful.  Accordingly, the appropriate cause of action is one for embezzlement.  Since he rightfully possessed the money initially, the first element is satisfied.

The Plaintiff testified she did not authorize or intend certain payments, which the Court has determined to be in the amount of $91,310.07.  The power of attorney, that Mark Fickes signed, independently prohibited Mark Fickes to make payments, unless such payments were in the Plaintiff's best interests "as he in his best discretion deems advisable."[37]  The Defendants did not attempt to argue the payments were in the Plaintiff's best interests; and, the Court fails to see how unauthorized payments to the Defendants, their business, and their children were in the best interests of the Plaintiff.  "[Using entrusted money for the recipient's own purpose in a way he knows the entrustor did not intend or authorize" supports an embezzlement claim.  *United States v. Young*, 955 F.2d 99, 102 (1st Cir. 1992).  The Plaintiff's testimony that she did not independently authorize the payments is credible.  By signing the general power of attorney, Mark Fickes acknowledged and expressly agreed to act and perform in a fiduciary capacity consistent with the Plaintiff's best interests.  Accordingly, the Court finds the payments were not in the best interests of the Plaintiff and that Mark Fickes appropriated the money for a use other than which it was entrusted.  The Plaintiff has shown Mark Fickes misappropriated $91,310.07 of the Plaintiff's money.

To amount to embezzlement, "conversion must be committed by a perpetrator with fraudulent intent."  *In re Sherman*, 603 F.3d 11, 12 (1st Cir. 2010).  Indeed, embezzlement requires "fraudulent intent to deprive an owner of this property, coupled with an unlawful appropriation of the same."  *Hancey v. U.S.*, 108 F.2d 835 (10th Cir. 1940).  "It is knowledge that the use is devoid of authorization…that makes the conversion fraudulent and thus embezzlement."  *In re Sherman*, 603 F.3d 11, 13 (1st Cir. 2010).  All facts and circumstances, including Mark signing the power of attorney and failing to explain how the payments were authorized, convince the Court that these circumstances indicate fraud.

The Court concludes that Mark Fickes acted with fraudulent intent when he used the power of attorney to make $91,310.07 in unauthorized withdrawals, which served to benefit himself, his wife, their business, and their children.  The language of the power of attorney is unambiguous.  The Plaintiff's testimony that she did not authorize such payments is credible.  The Defendants' testimony was not credible given the inability to explain or demonstrate proper action.  The particular recipients of the payments and the self-dealing nature of such transactions dictate that this Court can arrive at no other conclusion than that Mark Fickes knew he was not authorized to make $91,310.07 in payments from the Plaintiff's accounts.[38]  Although possession

---

[37]      Exhibit 1 ¶ 3.

[38]      The embezzlement claim is predicated on the power of attorney granted in favor of Mark Fickes.  As such, the Plaintiff's embezzlement claims fails as to Marita Fickes.

of the money was initially lawful, by using the entrusted money for the Defendants' own purposes despite knowing the payments were not authorized by the Plaintiff, Mark Fickes acted with fraudulent intent when he signed the checks (or allowed the checks to be written or prepared) to deprive the Plaintiff of $91,310.07.[39]  The Plaintiff has proven her embezzlement claim under § 523(a)(4) against Mark Fickes, rendering $91,310.07 nondischargeable.

### ii.   Marita Fickes.

Marita testified she was the legal signatory on the Plaintiff's Bank One account, from which the following four checks were made: check no. 2521 for $2,556.50; check no. 2469 for $996.48; check no. 2545 for $2,000.00; and check no. 2547 for $1,500.00, the total of which is $7,052.98.

As a signatory on the account, Marita was afforded lawful possession of the funds, rendering her initial possession lawful.  *See U.S. v. Goodstein*, 883 F.2d 1362, 1371 (7th Cir. 1989).  The Plaintiff testified credibly that she did not authorize these checks to be paid and never intended their payment.  Marita's testimony lacks credibility.  Marita testified the payments were loans authorized by the Plaintiff and which she paid back by, at least in part, paying the Plaintiff's rent.  Marita, however, did not provide any documentation corroborating her testimony and the Court finds her testimony lacks credibility.  The Court concludes that based on the facts and circumstances presented, Marita acted with a fraudulent intent to deprive the Plaintiff of her property.  Accordingly, the Plaintiff has proven her embezzlement claim under § 523(a)(4) against Marita Fickes, rendering the amount of $7,052.98 nondischargeable.

### 3.   Larceny.

Larceny, under federal common law, is defined as "the felonious taking of another's personal property with intent to convert it or deprive the owner of the same."  *In re Ormsby*, 591 F.3d 1199, 1205 (9th Cir. 2010); *see In re Graziano*, 35 B.R. 589, 594 (Bankr. E.D.N.Y. 1983) ("Larceny is defined as the fraudulent and wrongful taking and carrying away the property of another with intent to convert such property to the taker's use without the consent of the owner. [L]arceny does not differ from embezzlement except with respect to the manner in which the funds or property come into the possession of a party.") (citations omitted).  Although the Tenth Circuit has not directly held that it uses the federal definition of larceny, the Court may presume it does since it uses the federal definition of embezzlement.  *In re Wallace*, 840 F.2d 762, 765 (10th Cir. 1988) (the Tenth Circuit uses the federal common law definition of embezzlement rather than otherwise applicable state law); *In re Graziano*, 35 B.R. 589, 594 (Bankr. E.D.N.Y. 1983) ("[t]he definitions of the terms larceny and embezzlement in § 523(a)(4) are to be determined under federal common law").

---

[39]     Clearly, the Plaintiff has shown that she has been permanently deprived of these funds.  The Defendants have provided no evidence of showing the repayment of or any credit due for their use (other than payments required of them by the Settlement Agreement).  The Court concludes that Mark Fickes acted with fraudulent intent to permanently deprive the Plaintiff of these funds.

### i.  Mark Fickes.

Pursuant to the power of attorney, all property of the Plaintiff was entrusted to Mark Fickes.  Mark's initial possession of all bank accounts was lawful.  Accordingly, the Plaintiff's claim for larceny as to Mark fails as a matter of law.

### ii.  Marita Fickes.

Marita Fickes testified she would fill-out the checks from the Plaintiff's brokerage account and her husband, pursuant to the power of attorney, would sign them.[40]  Mark Fickes testified he would sign the checks without question, trusting his wife.  Marita was not a signatory on the brokerage account.  Check no. 0101 for $5,000.00, check no. 0109 for $10,000.00, and check no. 0190 for $7,500.00, for a total of $22,500.00, were checks written, but not signed, by Marita.  All of these checks were made payable to Marita.  As previously found, the Plaintiff neither authorized nor intended any of these checks to be paid.

Larceny is "the felonious taking of another's personal property with intent to convert it or deprive the owner of the same."  *In re Ormsby*, 591 F.3d 1199, 1205 (9th Cir. 2010).  As to the $22,500 in checks made payable to Marita, the Plaintiff never entrusted this property to Marita, nor did Marita ever have lawful possession of the property.  Accordingly, the appropriate cause of action is one for larceny.

The facts and circumstances presented during trial demonstrated to the Court that Marita knowingly intended to permanently deprive the Plaintiff of the $22,500.  Marita claimed $7,500 of the $22,500 was authorized by the Plaintiff to "spend down" her assets, with the remaining $15,000 authorized as loans for McBlaine Designs.  The Plaintiff adamantly opposed any suggestion that she authorized or supported spending down her assets to qualify for Medicare.  Marita's testimony that the money was a loan or otherwise authorized lacks credibility.  Considering the Plaintiff's testimony to the contrary, the parties' history of formally documenting loans, the fact that Marita made the checks payable to herself and not McBlaine Designs, and Defendants' failure to offer any evidence of loan repayment, Marita's version of events is wholly without evidentiary support.  The Plaintiff has shown that Marita committed larceny when she wrote checks to herself and had her husband sign them—who claims to have done so without question.[41]  Accordingly, the Court concludes the Plaintiff has proven her larceny claim under § 523(a)(4) against Marita Fickes, rendering $22,500.00 nondischargeable.

The Plaintiff has proven her larceny claim under § 523(a)(4) against Marita Fickes, rendering $22,500.00 nondischargeable.

---

[40]   This does not include check nos. check no. 2521, 2469, 2545, and 2547, which were signed by Marita Fickes and written from the Plaintiff's Bank One account, a checking account where Marita Fickes was a signatory.

[41]   Given the amounts of the checks involved, the fact that they were drawn from his mother's accounts, and that they were made payable directly to Marita, the Court does not find it credible that Mark was not fully complicit in Marita's wrongdoing.

### D.      Section 523(a)(6).

Section 523(a)(6) provides in pertinent part:

(a)      A discharge under section 727…of this title does not discharge an individual debtor from any debt—

(6)      for willful and malicious injury by the debtor to another entity or to the property of another entity.

As with all subsections of § 523, the burden, by a preponderance of the evidence, rests on the creditor asserting nondischargeability.  *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).

The debtor's conduct must have caused "willful and malicious injury," *Berrien v. Van Vuuren*, 280 Fed.Appx. 762, *4 (10th Cir. 2008), which means "that the actor intend the consequences of an act, not simply the act itself."  *Kawauhau v. Geiger*, 523 U.S. 57, 61-62 (1998) (emphasis in original).  For a debt to become nondischargeable under § 523(a)(6), "the debtor must desire to cause the consequences of his act or believe that the consequences are substantially certain to result from it."  *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004); *In re Englehart*, 229 F.3 1163, *3 (10th Cir. 2000).  Indeed, since "willful" serves as a modifier in the phrase "willful injury," nondischargeability pursuant § 523(a)(6) "takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."  *Kawauhau v. Geiger*, 523 U.S. 57, 61 (1998).  Without proof of both willful and malicious injury, an "objection to discharge under [§ 523(a)(6)] must fail."  *In re Moore*, 357 F.3d 1125, 1129 (10th Cir. 2004).

Since "it is injury to the creditor which must have been intentional-not the action of the debtor which caused the accident," *Matter of Hartley*, 869 F.2d 394, 395 (8th Cir.), *affirmed on rehearing*, 874 F.2d 1254 (8th Cir. 1989) (en banc), the Plaintiff must prove that the Defendants willfully and maliciously intended to cause the particularized injury sustained by the Plaintiff.  If tortfeasors were liable for unintended injuries, then:

[e]very traffic accident stemming from an initial intentional act—for example, intentionally rotating the wheel of an automobile to make a left-hand turn without first checking oncoming traffic—could fit the description.  A "knowing breach of contract" could also qualify.  A construction so broad would be incompatible with the "well-known" guide that exceptions to discharge "should be confined to those plainly expressed."

*Kawauhau v. Geiger*, 523 U.S. 57, 62 (1998) (internal citations omitted).

"[A] willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances.  There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice."  *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934).  Hence, the fact a defendant converted the plaintiff's property is not dispositive under § 523(a)(6).

To constitute a *willful* act under § 523(a)(6), "the debtor must 'desire…[to cause] the consequences of his act…or believe [that] the consequences are substantially certain to result from it.'" *In re Moore*, 57 F.3d 1125, 1129 (10th Cir. 2004) (quoting Restatement (Second) of Torts, § 8A (1965)).  The Tenth Circuit uses a *subjective* standard in determining whether the Defendants desired to cause injury or believe the injury was substantially certain to occur.  *In re Tinkler*, 311 B.R. 869, 878-79 (Bankr. D. Colo. 2004) (citing *Via Christi Regional Medical Ctr. V. Englehart (In re Englehart)*, 229 F.3d 1163 (10th Cir. 2000) (unpublished)); *Mitsubishi Motors Credit of American, Inc. Longley (In re Longley)*, 235 B.R. 651 (10th Cir. BAP 1999). Also, the defendant must have intended to cause the particularized injury sustained by the plaintiff.  *Mitsubishi Motors Credit of American, Inc. Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir. BAP 1999).

Similarly, a *malicious* act under § 523(a)(6) is a wrongful act, done intentionally, without just cause or excuse.  *Tinker*, 193 U.S. 473, 486 (1904) (holding a showing of "actual spite or ill will on the part of a debtor toward the specific person injured by such debtor's act is not required").  Since the § 523(a)(6) standards for "willful" and for "malicious" necessarily overlap, "the malice prong is satisfied upon a showing the injury was inflicted *without just cause or excuse*."  *In re Tinkler*, 311 B.R. 869, 880 (Bankr. D. Colo. 2004) (emphasis in original).

Both Defendants testified the Plaintiff authorized the payments.  However, the Court has already found: (1) the Plaintiff's testimony that she did not authorize the payments authorized is more credible; (2) authority under the power of attorney was predicated on the Plaintiff's best interests; (3) payments to the Defendants, their business, and their children were not in the Plaintiff's best interests; and, thus, (4) the power of attorney did not independently provide the Defendants with authorization to make the payments.  Based on these findings, the Court concludes the payments were wrongful in that the Defendants were not authorized—under the power of attorney or otherwise—to make payments, which served to benefit themselves, their business, and their children.

Although the withdrawal of $91,310.07 from the bank account of another is more than sufficient to render the particularized injury of depletion of another's bank account that is *objectively* substantially certain to occur, such a finding does not satisfy the *subjective* standard used in the Tenth Circuit.  Unless the Plaintiff can at least show the Defendants subjectively believed the Plaintiff would sustain the particularized injury, the Plaintiff's § 523(a)(6) claim necessarily fails.

The Plaintiff introduced no evidence from which the Court may infer the Defendants' subjective intent for purposes of this cause of action.  The word "intent" never came up during trial.  Further, the facts and circumstances of the case are too attenuated for this Court to properly infer that either or both of the Defendants subjectively desired to cause injury or subjectively believed the injury was substantially certain to occur.  At most, their intent was to "spend down" the accounts to render the Plaintiff eligible for Medicare.  Accordingly, the Plaintiff has failed to show willfulness on the part of the Defendants to cause the particularized injury of deprivation of the Plaintiff's property.  The Court need not address whether the Plaintiff has shown malice.

Therefore, the Plaintiff has failed to show any portion of the $91,310.07 in unauthorized payments is nondischargeable pursuant to § 523(a)(6).[42]

### E.    Damages.

Pursuant to the settlement agreement entered into between the Defendants and the Plaintiff, the Defendants have paid $127,500.00 of the $300,000.00 settlement amount.  Neither party testified or otherwise introduced into evidence the causes of action asserted in the state court litigation that culminated with the settlement agreement.  The Court is unable to make any findings whether the Defendants are entitled to a reduction based on any prior payments made pursuant to the settlement agreement.  The Court will enter a nondischargeable judgment against in the amount of $91,310.07 with interest at the federal rate calculated from the date of the entry of the judgment pursuant to 28 U.S.C. § 1961.

Although the Plaintiff requested attorneys' fees and punitive damages, no authority was cited and no argument was made supporting either proposition.  The Plaintiff's requests are denied.

It is, therefore, ORDERED that $91,310.07 is the total amount determined to be nondischargeable, segregated between Marita Fickes and Mark Fickes and among various causes of action as follows:

ORDERED that $91,310.07 is determined to be nondischargeable against Mark Fickes pursuant to the Plaintiff's claims for (1) fraud or defalcation of fiduciary duty, and (2) embezzlement under § 523(a)(4); and it is

FURTHER ORDERED that $7,052.98 is determined to be nondischargeable against Marita Fickes pursuant to the Plaintiff's claim for embezzlement under § 523(a)(4); and it is

FURTHER ORDERED that $22,500.00 is determined to be nondischargeable against Marita Fickes pursuant to the Plaintiff's claim for larceny under § 523(a)(4); and it is

FURTHER ORDERED that judgment will be entered against Mark Fickes and Marita Fickes with interest to accrue at the federal rate from the date of judgment pursuant to 28 U.S.C. § 1961.

DATED: _____September 30, 2011._____          BY THE COURT:


_Howard Tallman_
_____
Howard R. Tallman
United States Bankruptcy Judge

---

[42]       The Court need not address each check comprising the $91,310.07 amount because the Plaintiff wholly failed to show *any* subjective intent whatsoever.